**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Lorenzo D. FARLEY (92–3538); Robert J. White (92–3539); and Charles B. Jones (92–3541), Defendants–Appellants.**

**Nos. 92–3538, 92–3539 and 92–3541.**

United States Court of Appeals, Sixth Circuit.

Argued June 21, 1993.

Decided Aug. 6, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 29, 1993.

---

646

Dale E. Williams, Jr., Asst. U.S. Atty., Office of U.S. Atty., Columbus, OH (argued and briefed), for plaintiff-appellee.

Steven A. Larson, Columbus, OH (argued and briefed), for defendant-appellant.

Before: KENNEDY and NORRIS, Circuit Judges; and ENGEL, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Defendants Lorenzo D. Farley, Robert J. White, and Charles B. Jones, appeal their jury convictions for extortion under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951, and for conspiracy to commit extortion in violation of 18 U.S.C. §§ 2 and 1951. On appeal, defendants claim (1) the evidence was insufficient to sustain the jury's verdict, and (2) the government's prosecutorial misconduct deprived them of their right to a fair trial. For the reasons stated below, we affirm.

## I.

The conspiracy upon which defendants' convictions are based involved the alleged sale by defendants of honorary Franklin County, Ohio deputy sheriff commissions from January 1985 through January 1986. In 1984, following a general election, Earl O. Smith was elected sheriff of Franklin County. The defendants were all involved in the campaign and they continued to raise money and provide assistance to Smith after the election. At all times pertinent to the indictment, defendant Farley was serving as a deputy sheriff of Franklin County and was responsible for issuing "honorary" deputy

sheriff commissions. Defendants Jones and White were associates of Farley and others holding office with the Franklin County, Ohio Sheriff's Department. Count I of the indictment charged defendants with conspiring to violate the Hobbs Act by extorting payments under color of official right, *i.e.*, taking money not due them or their office from several individuals who sought commissions as deputy sheriffs. It was charged that as part of this conspiracy, defendants solicited or caused to be solicited persons to purchase commissions as deputy sheriffs for Franklin County. The remaining six substantive counts in the indictment described specific solicitations.

One alleged sale of a deputy sheriff commission involved Edward Munyan, who operated massage parlors/houses of prostitution in Franklin County. In 1985, defendant White visited one of Munyan's parlors in order to solicit Munyan for a deputy sheriff commission. Munyan testified that he hoped a commission would protect him from being raided by the Franklin County Sheriff's Department. Munyan secretly tape recorded his meeting with White. At this meeting, White took a blank deputy sheriff application from a stack he had in his briefcase, helped Munyan complete it, and made arrangements for Munyan to be sworn in as a deputy sheriff. When these arrangements were made, White collected a check in the amount of $1,500 drawn on Munyan's personal account. Munyan wrote the check for his deputy sheriff commission payable to White on February 21, 1985.[1] After Munyan's initial swearing-in ceremony was aborted, arrangements were made for Munyan to receive a deputy sheriff commission through Fairfield County (rather than Franklin County). Munyan kept his deputy sheriff credentials for several months until they were revoked by the Fairfield County Chief Deputy upon his discovery of Munyan's occupation.

Sometime in the fall of 1985, the defendants met with Munyan and James Sylvania[2] at the Top Steak House in Columbus. Munyan testified that the purpose of the meeting was to set up a committee to sell deputy sheriff commissions. According to Munyan, defendants Farley and White had divided Franklin County into territories and assigned different individuals to sell deputy sheriff commissions in different areas. The price for the commissions was set at $500 and Jones emphasized that all payments had to be in cash. In exchange, purchasers would receive a deputy sheriff identification card and a badge. Although the identification cards contained the word "honorary," some of the badges were identical to those worn on the hats of deputy sheriffs.

At the Top Steak House meeting, Farley assigned Munyan a territory which included northern Franklin County. Several weeks after the meeting, Munyan went to a bar in Worthington, Ohio, called Sylvia's Back Door, where he met a friend (Watling) and the owner of the bar, Sylvia Schmidt. According to Munyan, Schmidt complained about problems she was having with the Worthington Police Department stopping her patrons for being drunk. Munyan then suggested she purchase a deputy sheriff badge and identification card for $500. After leaving the bar for several minutes, Schmidt returned and handed Munyan an envelope with $500 cash inside. In her grand jury testimony, Sylvia Schmidt denied ever paying money for a deputy sheriff commission.

Two other alleged sales of deputy commissions involved William Lauterbach, a used car salesman in Columbus and a long-time associate of defendant Jones. Lauterbach had given Jones $500 in February, 1985, for a deputy sheriff commission, and Jones then asked Lauterbach to see if any other car dealers might be interested in paying cash

---

**1.** The indictment charged that Munyan and White completed the application for an honorary commission on or about July 5, 1985, and that White paid the check at that time. Munyan also testified that he paid the check in the "summertime."

**2.** Sylvania was a former police officer that Munyan had been an informant for. Franklin County Assistant Prosecuting Attorney, Douglas Maser, was suspicious that monies paid for deputy sheriff commissions were being deposited into Earl Smith's campaign treasury and he asked Sylvania to keep his "eyes and ears open." In turn, Sylvania asked Munyon to let him know if any of the defendants contacted him about purchasing commissions.

for a commission. Lauterbach then solicited a number of used car dealers for defendants and was told that all money collected had to go to defendant Jones and cash was preferred. Several of the car dealers solicited by Lauterbach were Charles Grimmette, Peter Weimerskirch, Larry Jones, Gregory Boyer, and Gregory Randy Fields. The transactions involving Grimmette, Weimerskirch, and Jones were the subjects of counts 2, 4 and 5 of the indictment, respectively. The jury returned verdicts of not guilty on these counts.

In November, 1985, George "Frankie" Boyer was employed by Lauterbach at Berwick Auto Sales. Lauterbach approached Boyer to discuss his obtaining a deputy sheriff commission in exchange for a $500 fee. Boyer paid cash and received his commission several weeks later. He testified that he wanted the commission because "it seemed like the thing going around at the time."

Also in 1985, Lauterbach approached Gregory "Randy" Fields, the owner of a used car lot, about purchasing a deputy sheriff commission. Fields understood that to obtain a commission he would have to fill out an application and pay $500. Lauterbach took Fields downtown to have his commission processed. Defendant Farley finger-printed and photographed Fields. At trial, Fields could not recall whether he gave the $500 to Farley or Lauterbach, but before the grand jury he indicated the money was handed to Farley.

The defendants were charged in a seven (7) count indictment with substantive violations of the Hobbs Act and conspiracy under the Act. At the close of the government's case-in-chief, the defendants moved for judgment of acquittal on all counts and the District Court denied the motion. The defense did not call any witnesses. The jury returned verdicts, finding defendant Farley guilty on Counts 1 (Conspiracy), 6 (George Boyer), and 7 (Gregory Randy Fields); defendant White guilty on Counts 1 and 3 (Edward Munyan); and defendant Jones guilty on Counts 1 and 6. Counsel for defendants then renewed their Rule 29 motions for judgment of acquittal which again were denied. Defendants were each sentenced to three (3) years imprisonment and a $5,000 fine. The execution of the sentence of imprisonment was suspended and the defendants were placed on probation on the condition that they be confined for three months in a Community Treatment Center, pay the fine as ordered, and perform 300 hours of community service.

## II. Sufficiency of the Evidence

Defendants contend that the District Court erred in denying their motions for judgment of acquittal because the government failed to produce sufficient evidence that defendants' actions constituted violations of the Hobbs Act. Defendants claim that the monies solicited were not payments for the issuance of deputy sheriff commissions, but rather were donations to the campaign of Sheriff Smith or to his department generally for use in special projects. In reviewing the District Court's denial of a motion for judgment of acquittal, this Court considers the evidence as a whole, taken in the light most favorable to the prosecution, together with all legitimate inferences to be drawn therefrom, to determine "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Moreover, "[c]ircumstantial evidence is entitled to the same weight as direct evidence in this calculus [of determining sufficiency]." *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir.1985) (quoting *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986).

### A. Hobbs Act Violation

Defendants first argue that there is insufficient evidence to support their convictions because their actions do not fall within the proscriptions of the Hobbs Act, 18 U.S.C. § 1951. This Act provides, in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce ... by robbery or extortion or attempts or conspires so to do ... in violation of this section shall be fined not more than $10,-

000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

In *McCormick v. United States,* —— U.S. ——, ——, 111 S.Ct. 1807, 1813, 114 L.Ed.2d 307 (1991), the Supreme Court granted certiorari to consider (and clarify) "the meaning of the phrase 'under color of official right' as it is used in the Hobbs Act." In *McCormick,* a member of the West Virginia House of Delegates was prosecuted under the Hobbs Act for extorting payments in connection with his support during his 1984 reelection campaign of legislation to aid unlicensed doctors. The Supreme Court stated that when an official receives campaign contributions, the prosecution for Hobbs Act extortion involving such payments requires proof of a "quid pro quo." The Court held that extortion under color of official right is made out

> only if payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

*Id.* —— U.S. at ——, 111 S.Ct. at 1816. (emphasis added). Consistent with *McCormick,* this Court has recognized that mere solicitation of political contributions, without more, would not constitute a Hobbs Act violation; "[w]hat the Hobbs Act proscribes is the taking of money by a public official in exchange for *specific* promises to do or refrain from doing *specific* things.... In other words, there must be a quid pro quo."

3. To the extent defendants argue their actions are not official actions because honorary deputy sheriff commissions do not exist as a matter of law, this argument must also fail. This Court has held that
a state official's acceptance of money violates the Hobbs Act "so long as the motivation for the payment focuses on the recipient's office." [citation omitted] What matters is not wheth-

*United States v. Bibby,* 752 F.2d 1116, 1127 n. 1 (6th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986) (emphasis in original) (citation omitted).

Defendants contend that the "quid pro quo" requirement of *McCormick* has not been satisfied in this case because a "quid pro quo" suggests that payment be made in return for something of *comparable* value and the honorary commissions at issue do not create any rights, duties, or powers to act in the recipient (*i.e.,* are of no value). Defendants cite no authority to support this contention and neither *McCormick* nor *Bibby* incorporate a "comparable value" requirement. A "quid pro quo" is commonly defined as "something given or received for something else." Webster's Third New International Dictionary (1971). Similarly, it is "used in law for giving one valuable thing for another." Black's Law Dictionary 1248 (6th Ed.1990). The evidence in this case is sufficient to establish that the deputy sheriff commissions were valuable. Specifically, the record establishes that the honorary deputy sheriff badges were identical to those worn by official deputies of the Franklin County Sheriff's Department and were paid for by Franklin County. Additionally, Edward Munyan testified that he wanted a commission to prevent his business from being raided. Munyan also testified that he suggested Sylvia Schmidt purchase a commission after she complained that officers harassed her clients. Thus, the District Court was correct in finding that "it would be a violation of the Hobbs Act for the Sheriff of Franklin County, or for the defendants acting under the apparent authority of the sheriff or the sheriff's office, to solicit campaign contributions in exchange for deputy sheriff commissions issued by the sheriff as part of the function of his office— whether those commissions be as regular deputies, auxiliary deputies or honorary deputies." [3] Having determined that the Hobbs

er the official has "actual *de jure* power to secure" the desired item, but whether the person paying him "held, and defendant exploited, a reasonable belief that the state system so operated that the power in fact of defendant's office included the authority to determine recipients of the [commissions] here involved." *Bibby,* 752 F.2d at 1127.

Act applies, we now turn to consider whether there was sufficient evidence to establish that defendants were providing deputy sheriff commissions in exchange for money payments.

### B. Conspiracy

■ Defendants contend that the only evidence establishing any agreement amongst them to sell honorary deputy sheriff commissions was Edward Munyan's testimony regarding the meeting at the Top Steak House in the summer of 1985. Munyan claimed that at this meeting, defendants agreed to solicit contributions in exchange for deputy sheriff commissions. According to Munyan, the purpose of the meeting was to create the "Gold Star" club to sell commissions. Defendants argue that Munyan's testimony was so internally inconsistent and implausible that no reasonable fact finder could credit it. They point out that James Sylvania (while acknowledging that such a meeting occurred) testified that there was no discussion of commissions or the sale of commissions.

■ It is well settled in this Circuit that attacks on witness credibility are simply challenges to the *quality* of the government's evidence and not to the sufficiency of the evidence. *United States v. Adamo,* 742 F.2d 927, 935 (6th Cir.1984) (emphasis in original), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). It is equally clear that issues of witness credibility are for the jury. *United States v. Wynn,* 987 F.2d 354, 358 (6th Cir.1993); *United States v. Gallo,* 763 F.2d at 1518 (heeding the Supreme Court's direction that "[i]t is for [jurors] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story"); *Adamo,* 742 F.2d at 935 ("With trial judges precluded from assessing witness credibility when considering Rule 29 motions, it is only logical that appellate courts reviewing denials of such motions must also share in the same prohibition."). Some Courts have taken the position, however, that where exceptional circumstances can be demonstrated, the trial judge may intrude upon the function of credibility assessment. *See United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992) ("Where testimony is pat-

ently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation."); *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir.1989) ("The exception is an extremely narrow one, however, and can be invoked only where the testimony contradicts indisputable physical facts or laws."). No such exceptional circumstances exist in this case.

The government concedes, and the District Court found, that Munyan was unable to testify with any specificity as to the *dates* of various events (in that he recalled virtually every event as having occurred in the summer of 1985) and that overall his testimony was, on certain details, self-contradictory. There was, however, evidence presented to corroborate Munyan's testimony. Sylvania's testimony makes clear that defendant county officials met with Munyan and Sylvania at the Top Steak House. The jury heard evidence that Munyan used to be an informant for Sylvania and that Sylvania told Munyan to contact him if the defendants mentioned selling commissions. Thus, a rational jury could conclude that these sales were discussed at the meeting at the Top Steak House. Additionally, Rod Mullins testified that he and Bill Lauterbach met with the sheriff in April of 1986 "to set things up for this Gold Star Club." There was additional evidence presented at trial, apart from Munyan's testimony, which supports the jury's finding that there was an agreement amongst the defendants to solicit contributions in return for the issuance of commissions. *See infra.*

### C. Count 3—Edward J. Munyan

■ Count 3 of the indictment alleges that defendant White violated the Hobbs Act by "unlawfully caus[ing] to be obtained under color of official right ... $1,500 from and with the consent of Edward J. Munyan, which money Defendant ... Bob White was not entitled, in that ... Bob White obtained said money by virtue of his association with the office of the Sheriff of Franklin County, Ohio." Sufficient evidence supports this conviction. In addition to Munyan's testimony, the government introduced the tape recording of the meeting between Munyan and

White and the cancelled check from Munyan to White in the amount of $1,500.

### D. Count 6—George Boyer

 Count 6 of the indictment alleged that defendants Farley and Jones violated the Hobbs Act by "unlawfully obtain[ing] under the color of official right . . . $500, from and with the consent of George Boyer, which money defendants . . . were not entitled . . . in violation of Sections 1951 and 2." Defendants argue that they had nothing to do with the sale of the commission to Boyer because Bill Lauterbach was the only one with any demonstrable involvement. Pursuant to 18 U.S.C. § 2[4] this argument must fail. Lauterbach testified that he was recruited by defendant Jones to solicit money for the sheriff and sheriff's department from other car dealers. Lauterbach testified as to several $500 donations he solicited and the subsequent issuance of deputy sheriff commissions to these contributors. In addition, George Boyer's testimony indicates that although he may have considered his $500 payment to be a donation to the sheriff's department, he understood that this payment was also a requirement for receiving a commission:

> Q. What did you do personally in order to obtain the Deputy Sheriff commission or to apply for it?
>
> A. Well, I approached Mr. Lauterbach and I asked him about it . . .
>
> \* \* \* \* \* \*
>
> I filled out the paper and he took the paper, and, of course, there was a $500 contribution or—
>
> Q. Continue please.
>
> A. —fee, you know, to—I can't explain this. Donation more or less.
>
> Q. Did you get the commission?
>
> A. I'd say, yeah.
>
> Q. And who did you make this $500 donation to? Who did you give the money to?
>
> A. Bill [Lauterbach].
>
> Q. Now, in what form was that $500?

> A. Cash.

Thus, sufficient evidence exists to support defendants' convictions under this count.

### E. Count 7—Gregory Randy Fields

 Count 7 of the indictment alleges that defendant Farley violated the Hobbs Act by "unlawfully obtain[ing] under color of official right . . . $500 from and with the consent of Gregory Randy Fields which money . . . Larry Farley was not entitled." Again, sufficient evidence exists to support this conviction. Fields testified that his understanding regarding what he had to do to get a commission was to "fill out an application and pay $500." Fields also testified that Farley was present when he was sworn in as an honorary deputy sheriff. Thus, while "Mr. Fields, like Mr. Boyer, may have understood his $500 payment to be a donation to the sheriff's campaign, his testimony amply supports the conclusion that more was involved than the mere payment of political contributions." While the Supreme Court's decision in *McCormick* makes clear that a public official's reception of campaign contributions does not, by itself, constitute a violation of the Hobbs Act, sufficient evidence exists in the case at hand to support the conclusion that more was involved than the mere payment of political contributions. The issuing of honorary deputy commissions, in return for campaign contributions, satisfies the "quid pro quo" requirement set forth in *McCormick*.

### III. Prosecutorial Misconduct

Defendants contend that the government's failure to timely disclose exculpatory material, their presentation of allegedly false testimony, and their misleading and prejudicial remarks during closing argument, deprived defendants of their right to a fair trial. We address each issue in turn.

### A. *Brady* and Jencks Material

 Defendants claim that the government's failure to disclose, in a timely man-

---

4. 18 U.S.C. § 2 provides in pertinent part: Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

ner, the grand jury testimony of Sylvia Schmidt violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The obligation the *Brady* rule imposes on the government is,

> the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.... [A] majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*United States v. Presser,* 844 F.2d 1275, 1281 (6th Cir.1988) (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). Evidence which may be used to impeach a prosecution witness falls within the scope of the *Brady* rule and therefore must be disclosed upon defense counsel's request. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Here, Sylvia Schmidt testified before the grand jury that she did not pay for the issuance of her deputy sheriff commission. This testimony was directly contradictory to Munyan's testimony that Schmidt gave him $500 in exchange for her commission. It also contradicted several of the allegations in Count 1 of the indictment. Thus, pursuant to *Brady,* the government turned this testimony over to the defendants at the conclusion of its case-in-chief. Defendants contend that this disclosure was untimely.

■ This Court has held that due process requires only that disclosure of exculpatory material be made in sufficient time to permit the defendant to make effective use of that material at trial. *Presser,* 844 F.2d at 1284. The government will fulfill its constitutional obligation by disclosure at trial unless the defendant can establish that presentation of his defense was so prejudiced that he was prevented from receiving his constitutionally guaranteed fair trial. *Id.* at 1282; *United States v. Patrick,* 965 F.2d 1390, 1400 (6th Cir.) ("Delay [in disclosure] only violates *Brady* when the delay itself causes prejudice."), *cert. denied,* —— U.S. ——, 113 S.Ct.

376, 121 L.Ed.2d 287 (1992). Defendants' primary argument is that Schmidt's grand jury testimony should have been disclosed prior to the testimony of Munyan and Watling (the man at Schmidt's bar who testified he saw her hand Munyan an envelope that was later found to contain $500) so that the defense could effectively cross-examine those witnesses. In ruling on defendants' *Brady* claim, the District Court found:

> First, Ms. Schmidt's testimony that she did not purchase a commission would clearly be hearsay which would not have been admissible through the cross-examination of Mr. Munyan and Mr. Watling. Second, to the extent defendants believe Ms. Schmidt's out-of-court statements under oath would have been helpful in the cross-examination of Mr. Munyan and Mr. Watling, defendants already had the testimony of Ms. Schmidt which was introduced in a state court criminal action, *State v. Blackburn,* in which Ms. Schmidt, consistent with her grand jury testimony, denied that she purchased a commission. Defendants have failed to convince the Court that Ms. Schmidt's grand jury testimony would have significantly added to their cross-examination of Mr. Munyan and Mr. Watling.

We agree. Thus, the timing of the government's disclosure did not deprive the defendants of a fair trial.

■ The Jencks Act, 18 U.S.C. § 3500, requires the government to supply the defense with any material statement made by the witness, after the witness has testified at trial. Defendants contend that, pursuant to this Act, the government should have provided the defense with FBI summaries (FBI 302s) of Munyan's interview. Under this Court's "Adoption Test," a government report or notes of a witness' statement must be produced "if the notes from the interview were read back to and verified by the witness and if the report summarized the notes without material variation." *United States v. Williams,* 962 F.2d 1218, 1224 (6th Cir.) (quoting *United States v. Arnold,* 890 F.2d 825, 829 (6th Cir.1989)), *cert. denied,* —— U.S. ——, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992). Defendants offered no

proof that the statement was adopted or approved by Munyan. Thus, it was not clearly erroneous for the District Court to deny defendants access to the FBI 302. *See United States v. Minsky*, 963 F.2d 870, 875 (6th Cir.1992) (review of the district court's ruling on Jencks Act issue is under the clearly erroneous standard).

 Similarly, production of this statement was not required under *Brady*. As noted above, the defendant has a remedy for nondisclosure of *Brady* material only if he can show that there is a reasonable probability that " 'the omission deprived the defendant of a fair trial.' " *United States v. Frost*, 914 F.2d 756, 771 (6th Cir.1990) (quoting *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)). No such showing has been made here.

### B. Presentation of False Testimony

██ Defendants contend that the government knowingly presented false and prejudicial testimony before the jury when they had Dale Campbell testify regarding his alleged purchase of a deputy sheriff commission. According to Campbell's testimony, he had obtained a deputy sheriff's commission with defendant White's assistance. In 1989, his commission was revoked. Testimony from Campbell and John Downs, director of the Franklin County Sheriff's Office, established that Campbell, in a fit of anger, called the Franklin County Sheriff and demanded a refund of the $1,500 he paid for the now-revoked commission. Campbell later explained, however, that he did not pay for his commission and only said he had because he was angry his commission was revoked. Similarly, Campbell testified before the grand jury that he did not pay for his commission. However, as the District Court pointed out, the government was clearly attempting to show that during the relevant time period Campbell paid $1,500 for a commission.

██ In order to prevail on their claim that their convictions were obtained with the use of evidence that the government knew or should have known was false, the defendants "must show (1) that the statements were actually false; (2) the statements were mate-

rial . . .; and (3) [the] prosecution knew they were false." *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir.1986) (quoting *United States v. Chagra*, 735 F.2d 870, 874 (5th Cir.1984)), *cert. denied*, 484 U.S. 859, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987). Campbell's statements were not material because it is unlikely they could have affected the jury's decision. During the government's questioning of Campbell, the jury was informed that Campbell had made inconsistent statements about paying for his deputy sheriff commission. Thus, the jury had an opportunity to determine which of the two statements, if either, was actually true. Accordingly, introduction of evidence regarding Campbell's commission did not deprive defendants of a fair trial.

### C. Closing Argument

 Finally, defendants contend that the prosecutor engaged in misconduct during his closing argument by suggesting to the jury that defendants had personally benefitted from the sale of the deputy sheriff commissions. Specifically, the prosecutor said to the jury:

> But one particular troubling comment that Mr. Bodicker [defense counsel] made in his opening statement, remember he said that these Defendants were like sacrificial lambs with apples in their mouths. You know, when you think of a lamb, you think of an innocent creature. After hearing all of the evidence, are these men innocent? Another thing about a lamb. *You know, lambs don't have pockets wherein they can put money received from selling badges.*

(Emphasis added). Since no contemporaneous objection was made, this Court reviews defendants' allegation of prosecutorial misconduct for plain error. *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992) (en banc), *cert. denied*, ── U.S. ──, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993).

██ This Court is "generally reluctant to find reversible error unless the prosecutorial misconduct was egregious, continuous, and uncorrected by judicial intervention." *Id;* *See also United States v. Bess*, 593 F.2d 749, 757 (6th Cir.1979) ("the complained-of con-

duct will not rise to reversible error, notably if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury."). The conduct challenged here is an isolated statement insinuating the defendants kept the money they received for the sale of the commissions (to which no contemporaneous objection was made). As the District Court recognized, "where the money actually ended up, in fact, remains somewhat of a mystery." While there was no direct evidence indicating the defendants personally benefitted from the solicitation of the contributions, there was evidence that, with one exception, none of the contributions were reflected in the official campaign records of Sheriff Smith. Thus, we find that the prosecutor's remark was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial," nor "so gross as probably to prejudice" the defendants. *United States v. Vance,* 871 F.2d 572, 577 (6th Cir.), *cert. denied,* 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989) (citations omitted).

### IV.

For the aforementioned reasons, defendants' convictions are **AFFIRMED.**