**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0310n.06
Filed: May 29, 2008

No. 07-5157

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| WALTER P. DRAKE, | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | **O P I N I O N** |
| | ) | |

Before: SILER, MOORE, and McKEAGUE, Circuit Judges.

KAREN NELSON MOORE, Circuit Judge. A jury found Defendant-Appellant Walter P. Drake ("Drake"), a convicted felon, guilty of unlawfully possessing a firearm, in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Drake to 252 months of imprisonment. On appeal, Drake argues that the evidence was insufficient to sustain his conviction and that the district court abused its discretion by admitting a black hat (found near the weapon that he allegedly possessed) into evidence because there was no clear chain of custody. For the following reasons, we hold that there was sufficient evidence to sustain Drake's conviction and that the district court did not abuse its discretion by admitting the black hat into evidence. Therefore, we **AFFIRM** the district court's judgment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The Cleveland Park Community Center in Nashville, Tennessee often hosted basketball games. On the evening of March 2, 2005, Metro Park Rangers Richard Ellington ("Ellington") and Curtis Avant ("Avant") had been assigned to screen those entering the building to attend a basketball game. Before beginning this task, the officers encountered Drake in the hallway of the community center. Avant testified that Drake's "eyes got real big" when he saw the rangers and that "he turned and took off running." Joint Appendix ("J.A.") at 159 (Trial Tr. at 31:21-24). Avant "gave chase" and followed Drake through the back door of the community center, J.A. at 159 (Trial Tr. at 31:24-25); he found Drake standing just outside of the back door. Avant testified that from the angle at which Drake was standing, he could not see Drake's right hand but could tell that it was "cuffed."[1] J.A. at 162 (Trial Tr. at 34:1-2). Avant testified that he found it "unusual" that there "was stuff flying out the back of [Drake's] coat—like feathers or something like that." J.A. at 162 (Trial Tr. at 34:2-4).

Instead of following Drake, Ellington exited through the front door and went around the building. Though the sun had set, a lamp over the back door of the community center lit the scene. When Ellington approached Drake from an angle different from that of Avant, he testified that he saw what he thought was the pistol grip of a gun. At the suppression hearing,[2] Ellington testified,

---

[1]Although this word appears frequently in the record, it is not completely clear what "cuffed" means. *See* J.A. at 355 (Ellington Test., Trial Tr. at 199:13-15) ("Q: When you say "cuffed", you're not saying you could see his hand? A: No. It was tucked under his coat."). During oral argument, the government explained that a "cuffed" hand was identical to a "cupped" hand.

[2]Prior to the jury trial, Drake made a motion to suppress a statement from the date of his arrest. The district court denied the motion to suppress Drake's statement because it was not "obtained in violation of *Miranda*" and not the "result of an illegal seizure." Dist. Ct. Dkt. Sheet at 32 (4/21/06 Mem. Op. at 4).

"All I saw was the pistol grip. I didn't know what it was. I just saw the pistol grip and yelled 'gun.'" J.A. at 354 (Trial Tr. at 198:7-9) (quoting Suppression Hr'g Tr. at 59). Both rangers drew their guns, but, instead of complying with the rangers' commands to raise his hands, Drake ran away. Both rangers testified that Drake was wearing a dark-colored hat.

Avant chased Drake on foot, while Ellington used his police cruiser to drive down the fence line near the community center, engaging his spotlight to search for Drake. None of the rangers who testified stated that he saw Drake drop a gun. Once the rangers apprehended Drake, they patted him down for weapons; finding none, they placed him in the back of a police cruiser. Ellington asked Drake to tell him the location of the weapon. Drake responded that he did not have a weapon. Ellington testified: "[Drake] kept saying, [he] didn't have a weapon. I said, Okay, whatever you had, where is it? He said, I had a curtain rod and it's over there by the fence." J.A. at 306 (Trial Tr. at 150: 8-12).

Ellington was not involved in the physical search for the gun, but after Drake indicated that he had dropped something near the fence, Ellington radioed to Avant in order to share the information. Avant testified that a fellow ranger pointed out to him a black hat—that appeared to be the same one Drake had been wearing minutes before—next to a shotgun along the fenceline. Neither the hat nor the gun was covered by debris, indicating to the rangers that the items had been "freshly placed there." J.A. at 174-75 (Trial Tr. at 46:16-47:23). The rangers did not find a curtain rod. Avant testified that there were no other people in the wooded area near the railroad tracks that evening except the rangers and Drake.

At the time of his booking, the nurse in the police station informed the rangers that Drake needed to go to the hospital because of damage to his right hand (which was bleeding). The rangers

3

took Drake to the hospital, but he refused treatment. Avant testified that he was not sure when Drake hurt his hand, but did testify that one of the fences that Drake climbed as he ran away from the officers had sharp metal pieces at the top. The officers did not find blood on the weapon.

Ellington testified that the shotgun found by the officers was the *same* gun that he observed Drake carrying at the back door of the community center. He based this conclusion on his observation of the pistol grip in the lamplight by the back door of the community center before Drake ran away, and his observation of the pistol grip on the gun found by the officers near the fence. At the time of his trial testimony, Ellington had been a police officer for eight years in the state of Ohio and one and a half years in the Nashville Metro Park Police. He testified that "from [his] experience with weapons, a pistol grip means either a shotgun or a long gun." J.A. at 317 (Trial Tr. at 161:4-5).

Testing did not reveal Drake's fingerprints on the gun, though there were eleven or twelve prints on the gun and about four that were not able to be compared against any known prints (labeled "unidentifiable"). J.A. at 624 (Marsh Test., Trial Tr. at 451:1-18). However, the expert who testified on fingerprints stated that it was common for an individual to touch a weapon and not leave a fingerprint (especially if his hands were dry).

The record does not reveal what happened to the black hat found near the weapon immediately after its discovery on March 2, 2005. Avant testified: "I cannot testify to what happened to that hat. I don't remember what happened to that hat." J.A. at 180 (Trial Tr. at 52:1-9). It was not marked with an evidence tag, placed in a plastic bag, or photographed. It also did not appear in the clothing inventory taken when Drake entered state custody. However, during his transfer from state to federal custody, approximately nine months after his arrest, the hat appeared. Drake was permitted to wear his own clothing during the transfer; Federal Agent Rider ("Rider"),

4

who conducted the transfer, testified that Drake was holding a black hat when Rider picked up Drake from the Davidson County, Tennessee Sheriff's office. Having been alerted by an Assistant United States Attorney that a black hat relevant to the case was missing, Rider took the hat from Drake.

As a result of these events, a grand jury indicted Drake on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). A jury found Drake guilty on June 15, 2006. The district court sentenced Drake to 252 months of imprisonment, and Drake filed this timely appeal.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

When reviewing a sufficiency-of-the-evidence claim we determine

"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The *Jackson* standard requires us to view both circumstantial and direct evidence in a light most favorable to the prosecution. *United States v. Hofstatter*, 8 F.3d 316, 324 (6th Cir.1993), *cert. denied*, 510 U.S. 1131 (1994). Circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt.

*United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (internal quotation marks omitted). "In addressing sufficiency of the evidence questions, this Court has long declined to weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002) (internal quotation marks omitted). "This standard places a 'very heavy burden' upon a defendant making a sufficiency of the evidence challenge. *Id.* (quoting *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000)). "[W]e cannot overturn the jury's decision merely because it had to draw reasonable inferences to find [the

defendant] guilty." *United States v. Arnold*, 486 F.3d 177, 181 (6th Cir. 2007) (en banc). However, "this Court's power of review in these cases is not toothless. We have defined substantial evidence as being 'more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred.'" *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007) (quotation omitted). Exceptional circumstances, such as testimony that is "patently incredible or defies physical realities," *United States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)), could allow a trial judge to "intrude upon the function of credibility assessment." *Id*.

## B. Analysis

We hold that, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found all of the elements necessary to convict Drake of being a felon in possession of a firearm. The government needed to establish three elements in order to prove that Drake violated 18 U.S.C. § 922(g): (1) "the defendant had a previous felony conviction," (2) "the defendant possessed a firearm," and (3) "the firearm had traveled in or affected interstate commerce." *United States v. Walker*, 160 F.3d 1078, 1087 (6th Cir. 1998), *cert. denied*, 526 U.S. 1056 (1999) (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)). Only the second element is at issue in this case.

Drake argues "that this case presents the kind of exceptional circumstances that warrant a court's intrusion into credibility assessments that are normally not scrutinized." Appellant Br. at 23. Drake argues that "[i]t defies physical reality to believe" that an officer could identify the gun found near the fence as the same gun that he saw during "a brief, limited view—at night—of 'what

6

appeared to be [the protruding] pistol grip'" of a gun. Appellant Br. at 21-22. Drake argues that the fact that his fingerprints were not found on the gun, the fact that there was no blood on the firearm (even though his hand was bleeding so severely that he was taken to the hospital), and the fact that Ellington testified at one point that the weapon was a sawed-off shotgun and then later retracted the statement, led to the conclusion that Ellington's testimony that the weapon belonged to Drake was "implausible." Appellant Br. at 22.

Generally, our review does not permit us to make credibility determinations about witnesses or weigh evidence. *See Chavis*, 296 F.3d at 455. Drake argues that this is an exceptional situation that requires us to intrude upon the jury's credibility determinations. We conclude that there may be a case in which a jury's determination could be undermined by its reliance on testimony that defied physical reality, *see Farley*, 2 F.3d at 652, but the facts do not support such a conclusion in this case. Although there may be inconsistencies in the rangers' testimony, and it may be challenging to understand how Ellington could determine that the weapon found by the fence was identical to what he observed protruding from Drake's coat simply by viewing the pistol grip, the jury was entitled to credit the testimony of Ellington; we may not substitute our judgment for that of the jury. *See Chavis*, 296 F.3d at 455. In addition, even though Drake's fingerprints were not on the gun, the jury was entitled to credit the testimony of the fingerprint expert that it is common for a weapon to be handled by an individual and yet for no identifiable fingerprints to result from that contact. Similarly, the jury was entitled to come to its own conclusions about the absence of blood on the weapon (despite Drake's bleeding hand), and draw a reasonable inference from the evidence that the hat the rangers initially saw Drake wearing was the same hat found near the weapon by the fence. As stated above, the evidence "need not remove every reasonable hypothesis except that of

7

guilt" in order to uphold the verdict. *Humphrey*, 279 F.3d at 378 (quotation omitted). Testimony regarding the hat, in combination with Ellington's testimony that the pistol grip of the weapon found by the fence was identical to the one that he viewed protruding from Drake's coat, was sufficient for a rational trier of fact to establish, beyond a reasonable doubt, that Drake unlawfully possessed the weapon.

### III. ADMISSION OF THE BLACK HAT

**A. Standard of Review**

We review for abuse of discretion the district court's admission of evidence. *United States v. Davis*, 514 F.3d 596, 611 (6th Cir. 2008) (citation omitted). "We have explained that 'the district court's decision regarding this evidence should remain undisturbed unless [we are] left with the definite and firm conviction that the district court clearly erred in its judgment after weighing the relevant factors, improperly applied the correct law, or inappropriately used the wrong legal standard.'" *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 535 (6th Cir. 2005) (quotation omitted). We apply the "harmless-error test to evidentiary errors." *United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006). "In determining whether an error is harmless, the reviewing court must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened. In other words, we must find that it was more probable than not that the error materially affected the verdict." *Id*. at 520 (quotation omitted).

**B. Analysis**

We must determine whether the district court abused its discretion by admitting into evidence a black hat found near the weapon at issue in this case. Physical evidence, like the hat, "is admissible when the possibilities of misidentification or alteration are 'eliminated, not absolutely,

8

but as a matter of reasonable probability.'" *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997) (quoting *United States v. McFadden*, 458 F.2d 440, 441 (6th Cir. 1972)). In this case, the government needed to show that the hat offered was "in substantially the same condition as it was when the crime was committed." *United States v. Robinson*, No. 95-6225, 1996 WL 732297, at *2 (6th Cir. Dec. 19, 1996) (unpublished). Although a party may raise the possibility of tampering or misidentification, mere speculation does not render the evidence immediately inadmissible. *Allen*, 106 F.3d at 700 (citations omitted). Indeed, physical evidence may be admitted even if there is a missing link in the chain of custody, "so long as there is sufficient proof that the evidence is what it purports to be and has not been altered in any material aspect." *Robinson*, 1996 WL 732297, at *2 (quotation omitted). "Absent a clear abuse of discretion, 'challenges to the chain of custody go to the weight of the evidence, not its admissibility.'" *Allen*, 106 F.3d at 700 (quoting *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990)).

Drake argues that the government did not "establish a proper chain of custody to justify" the admission into evidence of a black hat with an FDNY label on it.[3] Appellant Br. at 25-26. Drake's attorney expressed concern to the jury that the hat allegedly seen at the crime scene was not originally described as having an FDNY logo and was not preserved as evidence. The government argued to the jury that the logo was on just one side of the hat and may not have been visible to the officers at the scene.

The evidence in the record does not indicate that the district court abused its discretion by admitting the hat. In order to establish a chain of custody such that the physical hat could be

---

[3]Drake did not argue that admission of testimony regarding the hat was an abuse of discretion, only that admission of the physical hat was an abuse of discretion.

introduced into evidence (not just testimony about the hat), the government established the following: both officers Ellington and Avant testified that Drake wore a dark-colored hat on March 2, 2005; no clothing items could be received from outside sources by Drake while he was in custody; winter hats were not given to inmates in Drake's facility; and the parties stipulated that Drake was in continuous custody from the time of his arrest. Based on these facts, we hold that the district court did not abuse its discretion by concluding that the hat was admissible—the *possibility* that someone could have tampered with or misidentified the hat does not render it inadmissible. *See Allen*, 106 F.3d at 700. Although it is disturbing that the hat did not appear in Drake's original clothing itemization in his booking record, that Avant testified that he did not "know what happened to the hat," J.A. at 223 (Trial Tr. at 95:1-2), that Drake was in custody for two days before his clothing was catalogued, that the hat was unremarkable (i.e. had no distinguishing features), and that the Assistant United States Attorney had informed Rider that they needed to find the hat and suddenly the hat appeared when Rider transported Drake to federal custody, the government presented sufficient information to establish that there is a reasonable probability that there was no misidentification or alteration. *See Allen*, 106 F.3d at 700.

Therefore, despite questions about the chain of custody, we conclude that, because there was no evidence of tampering with the hat, the district court did not abuse its discretion by admitting the physical hat into evidence. Moreover, even if the district court erred in admitting the hat, it is not more probable than not that the error materially affected the verdict because the jury had heard testimony about the hat to which Drake has not objected. *See Baker*, 458 F.3d at 520. Thus, the district court's admission of the hat into evidence did not constitute reversible error.

## IV. CONCLUSION

Because there was sufficient evidence to sustain the conviction and the district court did not abuse its discretion by admitting the physical hat into evidence, we **AFFIRM** the judgment.