NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0346n.06

Nos. 16-2639/2641/2649

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED**<br>Jul 13, 2018<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ZAFAR MEHMOOD (16-2639/2641); BADAR | ) | COURT FOR THE EASTERN |
| AHMADANI (16-2649), | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

**BEFORE:  MERRITT, WHITE, and DONALD, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  A jury convicted Defendants Zafar Mehmood and Badar Ahmadani ("Defendants") of conspiracy to commit health-care fraud and conspiracy to pay and receive kickbacks, and Mehmood of health-care fraud, conspiracy to commit money laundering, money laundering, and obstruction of justice.  The district court sentenced both Defendants to below-Guidelines terms of imprisonment and ordered them to pay approximately $40 million in restitution.  On appeal, Defendants raise several challenges to their convictions and sentences.  We **AFFIRM** their convictions, **VACATE** their sentences, and **REMAND** for resentencing.

## I. BACKGROUND

From 2006 to 2011, Mehmood, Ahmadani, and others ran a number of home-health-care companies that purported to provide physical therapy to home-bound Medicare beneficiaries.[1] In reality, the companies were engaged in a scheme to defraud Medicare.

The government presented evidence that Defendants and their co-conspirators hired and paid recruiters to use bribes, including cash and prescriptions for narcotics, to induce Medicare-eligible persons to sign up for in-home physical-therapy services with Defendants' companies. Defendants and their employees then created fake patient records with fabricated medical information to make it appear as if the patients needed and received physical therapy. The companies then submitted claims to Medicare for health-care services that were either not provided to the beneficiaries or were not medically necessary. In total, Defendants' companies submitted $47,219,535.47 in Medicare claims, and Medicare paid $40,488,106.98 on those claims.

Mehmood also controlled Exclusive Rehab Services, Inc. (Exclusive) and New Light Physical Therapy and Rehab, Inc. (New Light), which purported to provide staffing services to Mehmood's and Ahmadani's health-care agencies. The government asserted that Exclusive and New Light were shell companies used to launder the proceeds of the fraud for payment of kickbacks and Mehmood's personal use. The nominal owner of Exclusive was Mohammed Alam, a janitor at one of Mehmood's businesses; Mehmood's wife was the owner of New Light.

Law enforcement eventually caught up with the scheme and executed search warrants at Defendants' health-care agencies on November 3, 2011. On April 24, 2012, a grand jury returned an indictment against Mehmood and Ahmadani. Count 1 of the indictment charged Mehmood and

---

[1] The companies included Access Care Home Health Care, Inc. (Access), All State Home Health Care, Inc. (All State), Patient Care Home Care, Inc. (Patient), and Hands on Healing Home Care, Inc. (Hands on Healing or "HOH"). Mehmood was the owner and president of Access, Patient, and All State, and co-owned HOH with Ahmadani.

Ahmadani with conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349; Counts 2 through 5 charged Mehmood with health-care fraud, in violation of 18 U.S.C. §§ 1347 and 2; Count 6 charged Mehmood and Ahmadani with conspiracy to pay and receive health-care kickbacks, in violation of 18 U.S.C. § 371; Count 7 charged Mehmood with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and Counts 8 and 9 charged Mehmood with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. On December 16, 2014, a grand jury returned a separate indictment against Mehmood, charging him with two counts of obstruction of justice, in violation of 18 U.S.C. §§ 1512 and 2, based on Mehmood's removing incriminating documents from the Detroit office of the U.S. Department of Health and Human Services.

A jury found both defendants guilty of all charges. The district court sentenced Mehmood to 360 months' imprisonment, below the Guidelines-recommended term of 155 years, and Ahmadani to 96 months' imprisonment, below the Guidelines-recommended term of 180 months.[2] Both were also ordered to pay approximately $40 million in joint and several restitution.[3]

---

[2] As Mehmood's PSR explains, "based upon a total offense level of 43 and a criminal history category of I," Mehmood's "guidelines imprisonment range is life. However, as none of the counts of conviction carry a life statutory penalty, the guideline range becomes 155 years." (R. 13-1 at 19.) As to Ahmadani, his PSR explains that "[b]ased upon a total offense level of 37 and a criminal history category of I, [Ahmadani's] guideline imprisonment range is 210 to 262 months. However, the combined statutorily authorized maximum sentences are less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 180 months." (R. 14-1 at 14-15.)

[3] Specifically, Mehmood was ordered to pay $40,488,106.98, (R. 285, PID 5374), while Ahmadani was ordered to pay $38,150,113.64, (R. 298, PID 5507). The district court did not give a reason for the discrepancy.

## II. DISCUSSION

### A. Mehmood - Violation of the Court Interpreters Act

Mehmood first argues that the district court violated the Court Interpreters Act ("CIA"), 28 U.S.C. § 1827,[4] by proceeding with the trial in the absence of a previously appointed interpreter without a valid waiver of Mehmood's right to an interpreter, thus denying him a fair trial.

During a pre-trial status conference, the district judge initially assigned to the case noted that Mehmood "does not speak English as a first language" and "does not express himself precisely in English." (R. 127, PID 1130.) The successor judge appointed an interpreter for Mehmood based on the previous judge's remarks. On the fourth day of the trial, however, the judge questioned the need for the interpreter because she had not "seen any words interpreted." (R. 317, PID 8299.) Mehmood's counsel responded: "I'm sensitive to the court's concern. I'll address that after I confer with [Mehmood] and report to the court." (*Id.* at 8300.) The following day, the judge asked Mehmood's counsel at sidebar if Mehmood "waive[s] the interpreter." (R. 318, PID 8352.) Mehmood's counsel responded, "for now, your Honor, we are good without an interpreter." (*Id.*) The remainder of the trial continued without an interpreter.

Although Mehmood's failure to object to the absence of an interpreter triggers plain-error review, *United States v. Markarian*, 967 F.2d 1098, 1104 (6th Cir. 1992),[5] he asks us to review the issue de novo because it implicates "[t]he district court's compliance with the statutory procedure

---

[4] The CIA states that a party may waive the right to an interpreter "only if" the waiver has been made "expressly by [the party] on the record," "after opportunity to consult with counsel," and "after the presiding judicial officer has explained to such individual . . . the nature and effect of the waiver." 28 U.S.C. § 1827(f)(1).

[5] *See also United States v. Lulseged*, 688 F. App'x 719, 722 (11th Cir. 2017) (reviewing for plain error a defendant's failure to object to the district court's decision not to appoint an interpreter); *United States v. Rodriguez*, 211 F. App'x 467, 469 (6th Cir. 2006) (reviewing for plain error where defendant failed to object to the absence of an interpreter); *United States v. Garcia-Perez*, 190 F. App'x 461, 470 (6th Cir. 2006) (reviewing for plain error because defendant failed to object to the interpreter he received); *United States v. Camejo*, 333 F.3d 669, 672 (6th Cir. 2003) (reviewing for plain error where defendant failed to object to alleged translation errors).

for accepting a waiver of the defendant's right to utilize an interpreter." (Mehmood Br. at 18.)[6]

Mehmood cites *United States v. Murguia-Rodriguez*, 815 F.3d 566 (9th Cir. 2016) for support, but

the case is of no help to him. In *Murguia-Rodriguez*, the Ninth Circuit held that plain-error review

did not apply to a district court's error in proceeding with sentencing without first obtaining a valid

waiver of the defendant's right to an interpreter because the government failed to request—and

thus waived its right to—plain-error review. *Id.* at 574-75. That is not the case here. Thus, we

review Mehmood's claim for plain error.

> Plain-error review involves four steps.
>
> First, there must be an error or defect—some sort of [d]eviation from a legal rule—
> that has not been intentionally relinquished or abandoned, i.e., affirmatively
> waived, by the appellant. Second, the legal error must be clear or obvious, rather
> than subject to reasonable dispute. Third, the error must have affected the
> appellant's substantial rights, which in the ordinary case means he must
> demonstrate that it affected the outcome of the district court proceedings. Fourth
> and finally, if the above three prongs are satisfied, the court of appeals has the
> discretion to remedy the error—discretion which ought to be exercised only if the
> error seriously affect[s] the fairness, integrity or public reputation of judicial
> proceedings.

*Puckett v. United States*, 556 U.S. 129, 135 (2009) (alterations in original) (internal citations and

quotation marks omitted).

Although it is well-settled that the defendant, not the government, bears the burden of

demonstrating plain error, *United States v. Olano*, 507 U.S. 725, 734-35 (1993), Mehmood argues

that we should "refuse[] to place the onus on the defendant to prove plain error on the basis of a

silent appellate record." (Mehmood Reply Br. at 6.) Instead, relying on *United States v. Tapia*,

631 F.2d 1207, 1210 (5th Cir. 1980), he urges us to remand for a new trial or "remand to the district

court for a hearing to determine whether the absence of an interpreter inhibited [the defendant's]

---

[6] Mehmood also argues that the district court's failure to comply with the statutory procedures for waiver is "indefensible" and necessitates "a reversal of Mehmood's convictions, and a remand for a new trial." (Mehmood Br. at 24.)

comprehension of the proceedings, or whether such failure prevented him from assisting his counsel." (Mehmood Br. at 6 (internal citation marks and citation omitted).) To be sure, in *Tapia*, the Fifth Circuit did remand for a hearing to determine whether the absence of an interpreter "inhibited [the defendant's] comprehension of the proceedings," 631 F.2d at 1210; however, *Tapia* did not involve plain-error review, and the case predates the Supreme Court's clear admonition that "[w]hen an appellate court considers error that qualifies as plain, the tables are turned on demonstrating the substantiality of any effect on a defendant's rights: the defendant who sat silent at trial has the burden to show that his 'substantial rights' were affected." *United States v. Vonn*, 535 U.S. 55, 62 (2002) (citation omitted). We, therefore, review for plain error.

Pursuant to the CIA, a party may waive the right to an interpreter "only if" the waiver has been made "expressly by [the party] on the record," "after opportunity to consult with counsel," and "after the presiding judicial officer has explained to such individual . . . the nature and effect of the waiver." 28 U.S.C. § 1827(f)(1). Only then may the presiding judicial officer approve the waiver. *Id.* Here, the district court failed to comply with the clear language of the CIA by accepting the waiver from Mehmood's counsel at sidebar instead of from Mehmood on the record, and by failing to explain to Mehmood the nature and effect of the waiver. Thus, the district court erred.

Further, because the district court failed to effectuate the protections enshrined in the clear and unambiguous language of the CIA, the error was plain. *See In re Sealed Case*, 573 F.3d 844, 851 (D.C. Cir. 2009) (district court's failure to comply with statute prohibiting courts from considering rehabilitative goals in sentencing was plain error because the statute "speaks with absolute clarity"); *United States v. Molina*, 356 F.3d 269, 276 (2d Cir. 2004) (district court's failure to state reasons for a sentence enhancement it imposed was plain error because it "did not satisfy

th[e] unambiguous [statutory] mandate" to "state in open court the reasons for the imposition of the particular sentence"); *see also United States v. Merlos*, 8 F.3d 48, 51 (D.C. Cir. 1993) (explaining that an error can be plain if it violates an "absolutely clear" legal norm, "for example, because of the clarity of a statutory provision").

The third prong of plain-error review—whether the error affected the defendant's substantial rights—"means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. "A defendant must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004) (citation and internal quotation marks omitted).

Here, there is no evidence in the record that the absence of an interpreter affected Mehmood's understanding of the proceedings. At no point did Mehmood indicate to the district court that the absence of an interpreter "inhibit[ed] [his] comprehension of the proceedings or communication with counsel or the presiding judicial officer," 28 U.S.C. § 1827(d)(1), nor did he raise the issue in his motion for acquittal or new trial. On appeal, Mehmood does not point to any difficulties communicating with his counsel or inability to understand the proceedings.

In contrast, the record demonstrates that Mehmood was able to successfully convey in English his many objections and arguments to the district court at sentencing after he rejected the assistance of an interpreter and waived his right to an attorney. The probation officer who interviewed Mehmood also reported no difficulty communicating with him, noting that Mehmood was fluent in both English and Punjabi. Thus, Mehmood has not carried his burden to demonstrate plain error because he has failed to demonstrate any effect on his substantial rights.

**B. Mehmood - Sufficiency of the Evidence**

Mehmood next argues that the district court erred in denying his motion for acquittal because his convictions of money laundering, conspiracy to commit money laundering, and obstruction of justice were not supported by sufficient evidence. Specifically, he argues that: (1) "the government failed to produce sufficient evidence that the animating purpose of the bank transactions was concealment for a prohibited purpose under the money laundering statute rather than mere facilitation of the underlying health care fraud violations"; and (2) "the government failed to produce sufficient evidence to prove that Mehmood concealed patient files for the purpose of obstructing his prosecution for health care fraud." (Mehmood Br. at 25, 29.)

We review de novo the denial of a motion for acquittal. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). When considering a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "All reasonable inferences and resolutions of credibility are made in the jury's favor." *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013) (citation omitted). We may not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999) (citation omitted).

**1. Money Laundering**

To find Mehmood guilty of money laundering, the jury was required to find beyond a reasonable doubt that Mehmood engaged in "a financial transaction . . . involv[ing] proceeds from specified unlawful activity" "knowing that the transaction is designed in whole or in part to conceal

or disguise the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1956(a)(1)(B)(1).[7]

Mehmood argues that the financial transactions at issue—executing and cashing two checks drawn on Exclusive's bank account, pre-signed by Alam, and made out and delivered by Mehmood to his intermediary, Tausif Rahman, for payment of kickbacks to recruiters and for Mehmood's personal use—were not "designed to conceal." Rather, he argues, the transactions merely furthered the underlying fraud scheme, and the government failed to present sufficient evidence that concealment was one of the purposes that drove Mehmood to engage in the transactions in the first place.

Mehmood is correct that to prove money laundering, "it is not enough for the government to prove merely that a transaction had a concealing effect," or "that the transaction was *structured* to conceal the nature of illicit funds." *United States v. Faulkenberry*, 614 F.3d 573, 586 (6th Cir. 2010). "Concealment—even deliberate concealment—as mere facilitation of some *other* purpose [e.g., fraud], is not enough to convict. . . . What is required, rather, is that concealment be an animating purpose of the transaction." *Id.* We conclude that the evidence, viewed in the light most favorable to the government, was sufficient for the jury to find that concealment was an animating purpose of Mehmood's transactions.

As Mehmood concedes, his "businesses could not make the payments directly to the marketers due to the anti-kickback provisions of federal law." (Mehmood Br. at 28.) Instead, to circumvent the law, the payments were made indirectly through Mehmood's shell company. A rational juror could thus infer that Mehmood set up the shell company and structured the transactions to avoid being directly linked to the payments and evade detection, and that

---

[7] The Supreme Court has held that the word "designed" requires proof of a purpose. *Cuellar v. United States*, 553 U.S. 550, 563-64 (2008).

Mehmood's animating purpose was "to cleanse the funds of their fraudulent taint." *United States v. Patel*, 651 F. App'x 468, 473 (6th Cir. 2016). And because "purpose and structure are often related[,]" *Cuellar*, 128 S.Ct. at 2004, "proof that a transaction was structured to conceal a listed attribute[8] of the funds can yield an inference that concealment was a purpose of the transaction." *Faulkenberry*, 614 F.3d at 586 (citation omitted).

Additionally, because Mehmood kept some of the money for his personal use, facilitation of the health-care fraud was not the only purpose of the transactions. Concealment need not be the only or dominant purpose of the transaction; the statute requires only that the transaction be designed "in whole or in part" to conceal. 18 U.S.C. § 1956(a)(1)(B). Here, Rahman testified that Mehmood directed him to cash the two checks at issue and return a portion of the money to Mehmood.[9] Thus, viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence that concealment was, at least partially, an animating purpose for conducting the transactions rather than merely a mechanism used solely to facilitate the health-care fraud.

---

[8] "Listed attribute" refers to the nature, the location, the source, the ownership, or the control of the proceeds. *Cuellar*, 553 U.S. at 559.

[9] Q. All right. This check is written out to you?
A. Yes.
Q. Do you know whether this money was for you?
A. No.
Q. What was this money for, to your recollection?
A. I actually had this check deposited into my account and I gave the cash to Mr. Zafar Mehmood.
Q. And why did you do that?
A. I was told by Mr. Mehmood.
. . .
Q. If we could look at the check. What is that?
A. That's the check written to me in the amount of $5,000.
. . .
Q. And what were your instructions for Mr. Mehmood to do with it?
A. To use it for the marketing.
Q. Or for him?
A. Or for him.
(R. 319, PID 8579-82.)

## 2. Obstruction of Justice

To find Mehmood guilty of obstructing justice, the jury was required to find beyond a reasonable doubt that Mehmood (1) "altered, destroyed, mutilated, or concealed a record, document, or other object;" (2) "acted knowingly;" (3) "acted corruptly;" and (4) "acted with the intent to impair the record, document, or object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1).

The government presented evidence that although Mehmood was detained pending trial he was granted temporary release from custody to accompany his attorneys to the office of the U.S. Department of Health and Human Services ("HHS") in Detroit to prepare for trial and review original patient records and other materials seized from Mehmood's companies. HHS discovered that certain incriminating, original pages were missing following Mehmood's three visits and law enforcement found these pages in Mehmood's cell upon executing a search warrant.

At trial, the government presented evidence that the original patient files had been scanned by the government prior to Mehmood's examination of those files at HHS. The government argued: "we're able to take both what was left after Mehmood's visit [to HHS,][(Ex. 352)], as well as the documents that were seized from Mr. Mehmood's cell[, (Ex. 350A)], and if we put them together, they match exactly" to the scan of the original records produced before Mehmood's visit to HHS, (Ex. 351). (R. 322, PID 9340.) Specifically, the government focused on the file of Janie Drake, comparing a scanned version of the Drake file made before Mehmood's visit, to a version of the original Drake file scanned immediately after Mehmood's visit, (Ex. 352), to reveal the missing pages. The missing pages, (Ex. 350A), were later found in Mehmood's cell.

Mehmood now seizes on the government's argument at trial that the pre- and post-HHS-visit scans "match[ed] exactly." (R. 322, PID 9340.) He argues that because the two scans contain

certain dissimilarities, they do not "match exactly," and thus Exhibit 351 cannot be a reliable representation of the contents of the Drake file as originally seized. (Mehmood Br. at 34 ("In light of the dissimilarities . . . , the case agent's testimony that Exhibit 351 is a scanned duplicate of the original Drake file viewed by Mehmood at the HHS field office 'defies physical realities' and 'contradicts indisputable physical facts.'" (citing *United States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993)).) Stated differently, Mehmood argues that the dissimilarities prove that "Exhibit 351 and Exhibit 352 . . . were not created from the same physical document," (Mehmood Reply Br. at 15), and thus Exhibit 351 "should be excluded from this Court's review of the sufficiency of the evidence." (Mehmood Br. at 34.)[10]

Mehmood's argument fails. First, the complained-of dissimilarities are minute: stray pen marks, additional or misaligned punch holes, additional staple marks or staple marks in different locations, a speck of dust or stray piece of lint, or slight discoloration or stains. Mehmood identifies no substantive differences between the two scans. And the differences he does point to do not make Exhibit 351 inherently unreliable because the scans were made of the originals at different times and after they were reviewed and handled.

Second, Mehmood did not make this argument to the jury, did not explore the alleged dissimilarities at trial, and did not raise the issue in his motion for acquittal. He never argued, as he does now, that certain dissimilarities undermined the authenticity of the exhibit. Instead, he asks that we draw our own conclusions about the scans and "give no weight to this evidence because it is irreconcilable with the physical facts." (Mehmood Reply Br. at 10.) We decline to entertain Mehmood's argument about the alleged dissimilarities because "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at

---

[10] Mehmood also separately argues that the district court abused its discretion in admitting Exhibit 351, addressed *infra*.

trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). "[T]he court cannot substitute its judgment of the evidence or the facts for that of the jury, since ascertaining the facts is within the exclusive province of the latter." 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524 (4th ed.); *see also United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999).[11]

Mehmood also points to other evidence he argues undermines his obstruction conviction, such as testimony that: (1) neither Mehmood's attorney nor the HHS agents saw Mehmood take any patient files from the HHS office; (2) "Medicaid providers may have legitimate business reasons to create multiple copies of a patient file"; and (3) Mehmood's attorneys had given him copies of patient records that he kept in his cell. (Mehmood Br. at 34-35.) But the jury heard this testimony and chose to give it little weight. Instead, the jury permissibly credited the testimony of the FBI agent who executed the search of Mehmood's cell and who testified that the pages recovered from Mehmood's cell were the missing *originals* because "the paper was indented as if being pressed by a point of . . . a pen," and because they contained an original, handwritten "sticky note" attached to the documents, as opposed to a photocopy of the note, and, thus, the recovered pages could not have been copies given to Mehmood by his attorneys or made at Mehmood's companies before his arrest. (R. 323, PID 9504-06; 9509-10.)

Thus, we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that Mehmood attempted to obstruct justice by removing certain incriminating patient files from HHS.

---

[11] Mehmood relies on a Sixth Circuit case stating that "[w]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." *United States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993). But as *Farley* explained, "[t]he exception is an extremely narrow one . . . and can be invoked only where the testimony contradicts indisputable physical facts or laws." *Id.* (citation omitted). The testimony of an HHS agent that Exhibit 351 was scanned before Mehmood's visit is not contrary to any indisputable facts. And the agent did not testify that the two scans "match exactly" – that was argued by the government. Thus, no exceptional circumstances exist to reject the testimony of the agent. The fact that the post-visit version contains some insignificant dissimilarities is not inconsistent with the HHS agent's testimony that Exhibit 351 is a scanned duplicate of the original Drake file.

### C. Mehmood - Admission of Exhibit 351

Next, Mehmood argues that the district court abused its discretion in admitting Exhibit 351 because the exhibit was not properly authenticated and the government failed to establish a proper chain of custody.

We review the district court's evidentiary rulings for an abuse of discretion, which occurs when the district court "relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard," *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) (internal quotation marks omitted), or "when we are firmly convinced that a mistake has been made, i.e., when we are left with a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003) (citation omitted).

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Similarly, "[t]o establish a chain of custody sufficient to make evidence admissible, the proponent need only prove a rational basis from which to conclude that the evidence is what the party claims it to be." *United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010) (internal quotation marks omitted). *See also* 2 McCormick On Evid. § 213 (7th ed.) ("The standard of proof requires only evidence from which the trier could reasonably believe that an item still is what the proponent claims it to be."). The possibility of misidentification or alteration must be "eliminated, not absolutely, but as a matter of reasonable probability." *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997) (citation omitted).

Here, Exhibit 351 was authenticated by HHS agent James Grzeszczak, who testified how the patient records were obtained, maintained, and tracked, and that they had been scanned before

Mehmood's visit to the HHS, a copy produced to the defense in discovery, and the originals viewed by the defense at HHS. Mehmood, however, calls into question the authenticity of the exhibit because of the minimal differences between the two scans. But "foundational requirements are essentially requirements of logic, and not rules of art. Thus, even an altered item of real evidence may still be admissible if the pertinent features which make it probative remain unchanged." 2 McCormick On Evid. § 213 (7th ed.). Here, aside from the minor dissimilarities, the pertinent features of the files remained unchanged. As caselaw makes clear, Mehmood must do more than "merely rais[e] the possibility of tampering or misidentification . . . to render evidence inadmissible." *United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004) (citation omitted). And, as discussed, those dissimilarities were not brought to the district court's attention.

Mehmood next argues that "[t]here was a total failure to establish a chain of custody for Exhibit 351," because "[d]uring cross-examination, the case agent was unable to provide even basic information regarding the source document used to prepare the duplicate, the date on which it was scanned, or the identity of the individual who did the scanning." (Mehmood Br. at 38.) But "challenges to the chain of custody go to the weight of evidence, not its admissibility." *Combs*, 369 F.3d at 938 (citation omitted). And "[w]here there is no evidence indicating that tampering with the exhibits occurred, courts presume public officers have discharged their duties properly." *Allen*, 106 F.3d at 700. Further, Mehmood misunderstands both the applicable evidentiary standard and the role of the judge. "Rule 901 does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001). "The authenticity of an exhibit is not a question of the application of a technical rule of evidence. It goes to genuineness and conditional relevance . . . .

Thus, the function of the judge is to ensure that there is sufficient evidence of authenticity, and the ultimate determination of whether to believe that evidence is left for the jury." 2 McCormick On Evid. § 212 n.19 (7th ed.).

Thus, the district court did not abuse its discretion in admitting Exhibit 351.

### D. Mehmood - Guidelines Calculation

Mehmood next argues that his 360-month sentence is procedurally unreasonable because the district court erroneously calculated his advisory Guideline imprisonment range. Specifically, Mehmood argues that the district court: (1) erroneously applied an excessive-loss enhancement; (2) violated a double-counting prohibition against overlapping sophisticated-means and sophisticated-laundering enhancements; (3) erroneously applied a second obstruction-of-justice enhancement; and (4) violated the *Ex Post Facto* Clause of Art. 1, § 10 of the U.S. Constitution by imposing a health-care-fraud enhancement.

We review sentences for procedural and substantive reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). The district court's conclusions of law are reviewed de novo, while its findings of fact are reviewed for clear error. *United States v. Moon*, 513 F.3d 527, 539-40 (6th Cir. 2008).

### 1. Loss Enhancement

Under the Guidelines, a defendant's offense level is adjusted according to the amount of loss[12] involved in the offense. U.S.S.G. § 2B1.1(b)(1). Where, as here, the district court determines that the loss is more than $25,000,000 but less than $65,000,000, the base offense level is increased by 22 levels. *Id.* § 2B1.1(b)(1)(L). Mehmood challenges that finding and argues that

---

[12] The amount of loss "is the greater of actual or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm" resulting from the offense. *Id.* § 2B1.1 cmt. n.3(A)(i). "Intended loss" is the pecuniary harm that was intended to result from the offense, even if "impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(ii).

the district court erred when it "use[d] the gross amount of Medicare claims, rather than the net gain . . . to calculate the loss."[13]  (Mehmood Br. at 44.)

We review the district court's fact findings regarding loss for clear error and its methodology for calculating loss de novo.  *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010).  The district court is to determine the amount of loss by a preponderance of the evidence. *United States v. Triana*, 468 F.3d 308, 320, 321 (6th Cir. 2006) (citation omitted).  In cases involving fraud, the district court "need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the [district] court's loss determination is entitled to appropriate deference."  U.S.S.G. § 2B1.1, cmt. n. 3(C).  Further,

> [i]n a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.

U.S.S.G. § 2B1.1, cmt. n.3(F)(viii).

Here, the district court took a different approach in concluding that the full amount of gross billings submitted by Mehmood's companies between 2006 and 2011—$47,219,535.47—constituted loss for sentencing purposes.  (R. 279, 5163-70; 5193-94.)   The district court determined that none of Mehmood's claims were legitimate—and thus could not be offset against

---

[13] Mehmood relies on two cases that are of no help.  He first relies on *United States v. Fowler*, 819 F.3d 298, 307 (6th Cir. 2016), but *Fowler* involved loss calculation for the purposes of restitution, not for sentencing purposes. Mehmood also relies on *United States v. White*, 492 F.3d 380 (6th Cir. 2007), in arguing that "the net-gain method for calculating loss applies in instances where the defendant is convicted of violating a Medicare rule despite having certified that he would comply with the rules." (Mehmood Br. at 45.)  But *White* does not stand for that proposition. The case held only that courts should, "to the extent practicable, adopt the 'net gain' method for calculating loss where a party is convicted of Medicare fraud due to violations of [Medicare's] 'related party' rule" – a rule not at issue here. *White*, 492 F.3d at 417.  And the Guidelines clearly state that [t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  U.S.S.G. 2B1.1, cmt. 3(B).

the aggregate billings—because Mehmood obtained access to the Medicare program by certifying that he would not engage in kickbacks "without any intention of living up to" that promise. (R. 279, PID 5164.) Indeed, testimony at trial established that Medicare would not have paid any of Mehmood's claims, including any legitimate ones, if Mehmood had disclosed his fraudulent scheme.

However, this approach is unsupported. The Eleventh Circuit has expressly rejected loss calculations based solely on a defendant's false representations to Medicare about the defendant's intent to follow Medicare's anti-kickback rules, and we do as well. *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) ("Even though [the government's Medicare witness] testified that Medicare would not pay a claim if they knew parties were receiving kickbacks, this is not sufficient to establish a loss to Medicare."). As the Guidelines state, "the aggregate dollar amount of *fraudulent* bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss." U.S.S.G. § 2B1.1, cmt. n.3(F)(viii) (emphasis added). Thus, to calculate loss for sentencing purposes, the value of any *legitimate* claims, if established, must be offset against the aggregate billings.

Here, the defense elicited testimony from multiple therapists, nurses, and counselors regarding legitimate medical services rendered to home-bound patients.[14] The district court, however, failed to consider that testimony; instead, it relied on its belief that Mehmood's fraudulent representations to Medicare allowed it to count all claims as losses without first considering whether any medical services claimed were legitimate.

The government defends the district court's error as harmless. To be sure, to qualify for a lower offense level, Mehmood would have to show that the district court's loss finding was wrong

---

[14] Even the government's main witness, Rahman, testified that not all services were illegitimate.

by at least $15 million. *See* U.S.S.G. § 2B1.1(b)(1)(K). However, "[a]n error with respect to the loss calculation is a procedural infirmity that typically requires remand." *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Here, we cannot say that the error is clearly harmless.

### 2. Obstruction-of-Justice Enhancements

Mehmood next argues that the district court erred when it applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and a three-level enhancement under § 3C1.3 for committing an offense while on release. The government concedes that the application of both enhancements was error, and that the district court should not have applied § 3C1.3. Thus, on remand for resentencing, the district court must recalculate Mehmood's offense level without the § 3C1.3 enhancement.

### 3. *Ex Post Facto* Violation

Mehmood next argues that the district court's use of a 2011 Guidelines manual at sentencing constituted an *ex post facto* violation because that manual included an enhancement under § 2B1.1(b)(7)(iii) for defrauding a government health-care program in an amount exceeding $20 million that was added after Mehmood's conspiracy concluded.

We review *ex post facto* challenges de novo. *United States v. VanHoose*, 437 F.3d 497, 500 (6th Cir. 2006). Generally, courts apply the Guidelines in effect at the time a defendant is sentenced. *Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013). However, "if the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *Ex Post Facto* Clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B.1.11(b)(1). "[A] violation of the *Ex Post Facto* Clause occurs 'when a defendant is sentenced

under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines range than the version in place at the time of the offense.'" *Huff*, 734 F.3d at 608 (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2078 (2013)).

The effective date of the § 2B1.1(b)(7)(iii) enhancement was November 1, 2011, when the 2011 Guidelines manual went into effect. Mehmood's indictment for health-care-fraud and money-laundering conspiracies, returned on November 1, 2011, stated that the conspiracies ended "in or around November 2011." (R. 42, PID 350, 353.) Mehmood was arrested on November 3, 2011.

At sentencing, the district court held that the 2011[15] Guidelines manual applied because "[t]o avoid this, Mr. Mehmood would have had to affirmatively withdraw from the conspiracy. Now, he was arrested on November 3rd of 2011, which was after the effective date of the 2011 guidelines. And there's no evidence that Mr. Mehmood affirmatively withdrew whatsoever from the health care fraud conspiracy." (R. 279, PID 5202.) Mehmood argues, however, that "[s]ince there was no proof that the conspiracy was still in existence on the date the 4-level health care fraud enhancement went into effect, the burden never shifted to Mehmood to prove that he withdrew from the conspiracy." (Mehmood Reply Br. at 22.) Mehmood's argument finds no support in caselaw.

Because "conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence." *Smith v. United States*, 568 U.S. 106, 111 (2013) (internal quotation marks and citations omitted). Thus, a defendant who is convicted of a conspiracy that began before, but continued after, a Guidelines amendment became effective may be sentenced based on the amendment without triggering any

---

[15] There was some dispute whether to use the 2011 or 2015 manual, but that is irrelevant here because both manuals contain the enhancement at issue.

*ex post facto* concerns. *United States v. Aviles*, 518 F.3d 1228, 1230 (11th Cir. 2008). "A defendant may escape the more severe amended penalty by withdrawing from the conspiracy prior to the effective date of the amend[ed Guidelines]." *Id.* at 1232; *see also United States v. Romans*, 823 F.3d 299, 320 (5th Cir. 2016); *United States v. Vallone*, 752 F.3d 690, 696 (7th Cir. 2014). To establish withdrawal from conspiracy, "a defendant must show that he or she took affirmative action to defeat or disavow the purpose of the conspiracy." *United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir. 1991).

> The defendant knows what steps, if any, he took to dissociate from his confederates. He can testify to his act of withdrawal or direct the court to other evidence substantiating his claim. It would be nearly impossible for the Government to prove the negative that an act of withdrawal never happened.

*Smith*, 568 U.S. at 113 (internal citation, quotation marks, and alterations omitted).

Here, Mehmood did not argue or present any evidence at sentencing that he took affirmative steps to disavow or defeat the purpose of the conspiracy prior to the effective date of the enhancement at issue.[16] Because Mehmood has not carried his burden of proving that he had withdrawn from the conspiracy before the amended Guidelines went into effect, we reject his *ex post facto* challenge.

### 4. Sophisticated-Means and Sophisticated-Laundering Enhancements

Mehmood argues that the district court impermissibly double-counted when it applied a two-level enhancement for "sophisticated laundering" under U.S.S.G. § 2S1.1(b)(3) and a two-

---

[16] In fact, the evidence seized during the search of Mehmood's businesses on November 3, 2011, suggests that the conspiracy continued until Mehmood's arrest. For example, photographs of Mehmood's offices taken during the search on November 3, 2011 show that Mehmood continued to employ the same means to avoid detection. In any event, Mehmood does not challenge the sufficiency of the evidence of his health-care-conspiracy conviction and he did not present any evidence at trial that he had withdrawn from the conspiracy, despite having the burden to establish this defense. *Smith*, 568 U.S. at 110-13.

level enhancement for a fraudulent scheme involving "sophisticated means" under U.S.S.G. § 2B1.1(b)(10)(C).

Although Mehmood failed to preserve this claim below, the government does not assert forfeiture or waiver. The Guidelines provide that the application of both enhancements is improper when the same conduct forms the basis of each enhancement. U.S.S.G. § 2S1.1, n.5(B).[17] On resentencing, the district court should address the propriety of the dual enhancement under the Guideline.

### E. Mehmood - Restitution and Forfeiture

Finally, Mehmood argues that the district court's restitution and forfeiture orders are erroneous because they rest on an erroneous loss determination.

The district court ordered Mehmood to pay $40,488,106.98 in restitution and ordered forfeiture in that amount, relying on the calculations of loss under the Guidelines. Although restitution and loss are not one and the same, it is permissible for the district court to base its order of restitution on the actual loss calculated for the purpose of sentencing. *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009); *United States v. Finkley*, 324 F.3d 401, 404 (6th Cir. 2003). However, because we conclude that the district court erred in calculating loss, we also remand for recalculation of the amount of restitution and forfeiture. *See United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir.), *cert. denied*, 138 S. Ct. 556 (2017) (remanding for recalculation of both loss and restitution where the district court based its restitution order on an erroneous calculation of the actual loss figure); *United States v. Radziszewski*, 474 F.3d 480, 487 (7th Cir. 2007) (same).

---

[17] Note 5(B) states:

If subsection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline.

## F. Ahmadani - Motion for Severance

Ahmadani first argues that the district court erred by not severing Defendants' trials. However, Ahmadani never asked to be tried separately from Mehmood. Rather, he unsuccessfully sought to have Mehmood's obstruction charge severed from his and Mehmood's joint health-care-fraud trial. Ahmadani now argues for the first time that he and Mehmood should not have been tried together at all. Because that argument was not preserved below, we review it for plain error.

Federal Rule of Criminal Procedure 8(b) allows for the joinder of defendants who "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense." The Supreme Court has commented that Rule 8(b) is meant "to promote economy and efficiency and to avoid a multiplicity of trials." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (citation omitted). Even when joinder is proper, however, a court may "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires," if a joint trial "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). Severance is only required if there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. But it is "well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540.

Here, Ahmadani fails to show "specific and compelling prejudice that would mislead and confuse the jury in the absence of a separate trial." *Walls*, 293 F.3d at 966. First, except for witnesses testifying about Mehmood's obstruction of justice, Ahmadani fails to point to any testimony that would have been excluded at his separate trial. Second, a spillover of evidence does not require severance, *Lopez*, 309 F.3d, at 971, and may be cured by limiting instructions. *Zafiro*,

506 U.S. at 539. The district court specifically instructed the jury that the obstruction charge did not relate to Ahmadani. (R. 323, PID 9442 ("You can only consider this testimony against Defendant Zafar Mehmood. You cannot consider it in any way against Defendant Badar Ahmadani.").) The district court, and the government as well, repeated this instruction several times, and "juries are presumed to follow their instructions." *Zafiro*, 506 U.S. at 540 (citation omitted). Third, Ahmadani does not argue that any particular testimony was so confusing that "a jury could [not] reasonably be expected to sort out the evidence." *United States v. Crotinger*, 928 F.2d 203, 206 (6th Cir. 1991). And, in any case, any confusion "must be balanced against society's interest in speedy and efficient trials." *Walls*, 293 F.3d at 967. Fourth, even if Ahmadani can show some prejudice given that Mehmood attempted to obstruct justice by stealing records of Ahmadani's patient, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39.

Thus, we conclude that the district court did not plainly err when it joined Mehmood's and Ahmadani's trials.

### G. Ahmadani - Confrontation Clause

Ahmadani next argues that admitting statements Mehmood made during an interview with law enforcement violated Ahmadani's Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968), because those statements implicated Ahmadani.

We review de novo claims that the admission of evidence violated the Confrontation Clause. *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009). In *Bruton*, the Supreme Court held that "[a]n accused is deprived of his rights under the Confrontation Clause when the confession of a nontestifying codefendant that implicates the accused is introduced into evidence

at their joint trial . . . even if the jury is instructed to consider the confession only as evidence against the codefendant." *United States v. Cope*, 312 F.3d 757, 780-81 (6th Cir. 2002) (citing *Bruton*, 391 U.S. at 137).[18] *Bruton* was later refined by *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), which limited *Bruton*'s reach to statements that *expressly* implicate the co-defendant and are "incriminating on [their] face," as opposed to statements "requiring linkages."

Here, concerned about potential *Bruton* violations, the district court ordered that Mehmood's statements be redacted to eliminate any reference to Ahmadani or the company he co-owned, HOH. Ahmadani, however, argues that "[t]he statements by Mehmood [were] clearly accusatory as to Ahmadani, even without mentioning Ahmadani's name or HOH." (Ahmadani Br. at 28.) But he does not point to any specific admitted statements, nor does he develop his argument any further. Our independent review of the trial testimony regarding Mehmood's interview with law enforcement does not reveal any statements that expressly implicated Ahmadani or were incriminating on their face.

Ahmadani also argues that the district court erred when it admitted some, but not all, of the statements Ahmadani made during his interview with law enforcement. Ahmadani claims that the district court should have allowed the remaining statements under the completeness rule of Federal Rule of Evidence 106 because his statements were "exculpatory." (Ahmadani Br. at 28.) Although "[o]ut-of-court statements made by a party-opponent are an exception to the general hearsay rule," "[t]his hearsay exception does not . . . extend to a party's attempt to introduce his or her own statements through the testimony of other witnesses." *United States v. Ford*, 761 F.3d 641, 651-52 (6th Cir. 2014) (citation and quotations marks omitted). "Precluding a defendant from eliciting

---

[18] Because *Bruton* is premised on the Confrontation Clause, it applies only to testimonial statements. *United States v. Arnold*, 486 F.3d 177, 192-93 (6th Cir. 2007) (en banc). Here, the government does not argue that the statements were nontestimonial.

inadmissible hearsay statements does not violate the Confrontation Clause." *Id.* at 652. And "[e]xculpatory hearsay may not come in solely on the basis of completeness." *United States v. Adams*, 722 F.3d 788, 826 (6th Cir. 2013). Further, although the statements Ahmadani sought to add were exculpatory, their omission did not render the testimony misleading or unfair.

Thus, Ahmadani's Confrontation Clause and Rule 106 challenges lack merit.

## H. Ahmadani - Loss Calculation

Ahmadani next argues that the amount of loss attributable to him—$38,150,113.64—and the resulting twenty-two-level enhancement were erroneous because his liability should be limited to the claims Medicare paid to HOH and only for the period in which he was listed as the co-owner of HOH.[19]

We review the method used to calculate loss de novo and any factual determinations for clear error. *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013).

The jury found Mehmood and Ahmadani guilty of conspiracy to commit health-care fraud and conspiracy to offer, pay, solicit, and receive kickbacks. Thus, as Mehmood's co-conspirator, pursuant to U.S.S.G. § 1B1.3(a)(1)(B), Ahmadani's Guideline range was to be determined in part based on:

> all acts and omissions of [Mehmood] that were: (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

Application Note Three to U.S.S.G. § 1B1.3 sets out a test that must be satisfied before a defendant is held accountable for the conduct of others. First, the district court must make particularized findings about "the scope of the defendant's agreement." *United States v. Campbell*,

---

[19] At most, he argues, he should be responsible for $6,723,828 – the total amount in claims paid by Medicare to HOH during Ahmadani's co-ownership of HOH from 2007 to 2008.

279 F.3d 392, 400 (6th Cir. 2002); U.S.S.G. § 1B1.3(a)(1)(B) & cmt. n.3. This finding "differentiate[s] between co-conspirators' varying degrees of culpability." *Campbell*, 279 F.3d at 400. The district court may consider "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others," U.S.S.G. § 1B1.3 cmt. n.3(B), but mere "aware[ness] of the scope of the overall operation" is insufficient, *Campbell*, 279 F.3d at 400. Second, the district court must make particularized findings about "the foreseeability of [the] co-conspirators' conduct." *Id.* Only conduct reasonably foreseeable to the particular defendant may be attributed to him. *United States v. Orlando*, 281 F.3d 586, 600 (6th Cir. 2002). Finally, even if the defendant could reasonably foresee conduct in furtherance of the conspiracy, the loss from that conduct will only be attributed to the defendant if the conduct falls within the scope of his particular agreement. *Campbell*, 279 F.3d at 400.

Here, the district court failed to make a finding that Mehmood's conduct was reasonably foreseeable to Ahmadani and failed to make particularized findings with respect to the scope of Ahmadani's agreement, as required by *Campbell* and the relevant Guidelines Application Note.

Ahmadani did not object to the district court's failure to abide by the above-mentioned authority, nor does he object to it on appeal. Instead, the parties and the district court reasoned that *United States v. Shannon*, 803 F.3d 778 (6th Cir. 2015) provides the appropriate framework. But *Shannon*, which applied § 1B1.3(a)(2), has no application here. There, the defendant objected to the district court's reliance on the defendant's own relevant conduct in calculating the loss, not on the acts of a co-conspirator. The Guidelines are clear, however, that "in the case of a jointly undertaken criminal activity," the analysis begins with § 1B1.3(a)(1)(B). Thus, we review for, and find, plain error. We remand for resentencing with instructions that the district court apply the proper framework for analyzing the attribution of a co-conspirator's conduct in calculating loss.

*See, e.g.*, *United States v. Harris*, 636 F. App'x 922, 927 (6th Cir. 2016); *United States v. Sullins*, 529 F. App'x 584, 588 (6th Cir. 2013); *United States v. Elias*, 107 F. App'x 634, 637 (6th Cir. 2004); *Campbell*, 279 F.3d at 400.

### I. Ahmadani - Ineffective Assistance of Counsel

Finally, Ahmadani argues that his conviction should be set aside because of his trial counsel's ineffective assistance. Specifically, he argues that his attorney failed to challenge the joinder of the trials and "failed to make an appropriate argument at sentencing relating to the amount of loss." (Ahmadani Br. at 29.)

However, this court has "adopted a general rule that a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal." *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012) (citation, quotations marks, and alterations omitted)). And Ahmadani fails to explain why this case presents the "rare instance[]" in which a defendant can pursue a claim for ineffective assistance on direct appeal.[20] *United States v. Yisrael*, 355 F. App'x 933, 934 (6th Cir. 2009).

Thus, we decline to rule on Ahmadani's ineffective-assistance claim.

### III. CONCLUSION

We **AFFIRM** Defendants' convictions, **VACATE** their sentences, and **REMAND** for resentencing.

---

[20] Further, Ahmadani's ineffective-assistance claim based on his counsel's "fail[ure] to make an appropriate argument at sentencing relating to the amount of loss" is moot in light of our remand for resentencing.